will call Mr. Flores whenever you are ready. In this Texas insurance case, the district court's judgment needs to be reversed because the decision to disregard the jury's limitations finding rests on three matter-of-law holdings that can't be sustained. First, the district court held that as a matter of law, the evidence here proved storm warnings that triggered the plaintiff's duty to engage in a reasonable investigation of wrongdoing. Second, the court held that the investigation they did take part in was unreasonable as a matter of law. And third, the district court held that if these plaintiffs had engaged in what the district court thought was reasonable diligence, that they necessarily would have uncovered the wrongdoing. Now, in order to affirm the judgment, the court has to agree with all three of those matter-of-law rulings on the theory that Woodbury proved every factual predicate conclusively. You know, of course, that your problem is with the 2008 quarterly statements. I think that's right, Your Honor, that that's probably the hardest part of the question about storm warnings, and I have an answer for that. I think it's important that we embrace the district court's opinion about the initial statements. We think that was correct. But I have a bullet list of answers. The most important part about the account statements is to realize that this is an insurance case, not a securities case. As a matter of law, it's insurance, because Texas law treats annuities as an insurance product, and it's also insurance as a matter of fact. But the question, regardless of how it's characterized, the question is whether the principal declined and those quarterly statements unequivocally showed that the principal declined, not only slightly but in most cases substantially. I take your point that that's what they showed, but I disagree with the premise. The question is whether the amounts declined, because I think the promises here are the promise of the monthly payment that came out every month and preserving the principal at the end of the day. Those were the real risks that we would look for to materialize. The statements did indicate that the principal was lower than what had originally been tendered. Is that not right? That is correct, Your Honor, but that's not dispositive here. I think it's a point in their favor. We certainly wouldn't move for judgment as a matter of law, but on our side, remember, the promise here was of the monthly payments, and those happened on track every single time. It's also important to note that before the downturn and after the downturn, the accounts performed just as were promised. Well, this is only a question of time bar, though. This is not a question of ultimate liability. The question is whether those plain quarterly statements would have put a reasonable person on notice to take action. I think that's right, Your Honor, and we submit that they did not, right? And one part of the question is that even if they triggered the storm warning, that's not the end of the case, because we still have to ask what would the plaintiffs have discovered if they pursued the storm warning and engaged in an investigation. And that's the second issue here, is the reasonable investigation they did take part in. These plaintiffs did exactly what Woodbury told them to do, the very same documents that show the declining balance, say, if you have questions, call your agent, Mr. Mierendorf, or call Woodbury. And that's what they precisely did, is called Mr. Mierendorf and pursued the matter, so much so that he answered their questions directly again and doubled down. He gave more misrepresentations and essentially recommitted the fraud. And this Court has seen that kind of precedent before. We've seen it. And what do you say to the suggestion that they weren't reasonably diligent? We say that they were reasonably diligent, or at least— I don't think you think that, but give me some sense of what that is. If you say that, you can say, well, it's a fact question. I think your decision in the Advocare case, Your Honor, would be analogous. There's a category of cases where there's an initial wrongdoing, a pursuit of the investigation, and then a second round of misrepresentations. And the general rule is that that is a question of fact. We saw it also in the Illinois Central decision. And if the special parts about this case make it more factual, not less. And this is why I say it's an insurance case, because there's a long line of precedent. There was someone that the first time they went to the actual obligor on this instrument and asked questions, they got the truthful response, which is no, that's not what this is. Oh, I don't think that's the case, Your Honor. If we're talking about Tacker, this occurred in 2012. This is the person who eventually discovered the wrongdoing. That's not conclusive here for a number of reasons. Number one, there's a timing problem. That happened in 2012, and we would need to prove what would be learned in 2009. And there's also a typicality problem. We don't know how Tacker. It happened in 2012, because that's when they first asked her. That's when they first. I'm misapprehending the fact. I thought the first time they went to whoever, Hacker, the insurance company said, no, that's not what this policy is. The insurance company never lied about this, unlike the agent. So let me try to tease out the factual distinction. Tacker is the person who actually discovered the wrongdoing here. But there was a prior contact. This is the 2009 incident involving Harrison. And Harrison sent a written request to Hartford, the company that issued the annuities. And she said, what's my payment amount, and how long is it going to last? And the response that came back is not consistent with the district court's ruling, and it's not consistent with Woodburn. You can see this response. It's Defendant's Exhibit 189, and there are two sentences. If the court will indulge me, I think they're important. When Harrison asks, what is my payment amount, and how long will it last? If they're right, the response we should have gotten is, your payments are going to end soon, and it dates certain, because you can calculate it, and it's so obvious. But that's not what they said. They said the following. You are currently enrolled in our automatic income program and scheduled to receive $3,074.98 monthly from this annuity. That's the first sentence. And the second sentence is, unfortunately, I'm unable to confirm how long the program will last. The program is currently set up to run indefinitely. And so, at best- That's completely inconsistent with what Marendorff told them, which is principal guaranteed and the income guaranteed for life. This is saying we don't really know, because we don't. Because guess what? This is an investment. It could have turned out, you know, I'm old enough to remember when interest rates were 20% or whatever. So, yes, if things went really great with the investments, this could go way up. The principal would go way up. The amounts could go way up. So, that's why they don't know. But that is very inconsistent with what Marendorff was telling them, which is we do know. You're going to get this amount for life. And then you're going to get your principal back. That, the statement from Hartford was nowhere near that. I think it's both consistent and inconsistent, Your Honor. When the statement says the program is set up to run indefinitely, I think a reasonable person can take that to mean that their payments are going to run indefinitely. Not when they say we don't know. We don't know. How is that consistent with guarantee? Which apparently Mr. Marendorff kept telling them. That's true, Your Honor. I'm not saying this isn't a point in their favor. I'm saying it's not a point in their favor as a matter of law. It can't be conclusive evidence, right? Here we have at least one instance in which they write directly to the person they were asked to inquire with, and they don't get the kind of response that Woodbury says they're going to give there. But I want to shift back, if I can now, to the idea of reasonable diligence. That asking Marendorff was sufficient. Because if that was a reasonable step for them to do, then the case is over. It doesn't matter if they could have discovered it in some other way. The question is whether it's reasonably diligent for someone in this position to seek out the answer by contact. You could have considered it as what a reasonable person would have perceived. And maybe not that someone is particularly naive as such, unless there's some other evidence that was the basis of the whole transaction that they trafficked on their naivety. This transaction on its face cannot work. I mean, unless, as described, I mean, it's, you know, anybody that knows any basic things or just thinks about it will realize that why is this guy giving me this guarantee for life against all of the vicissitudes of the market? He gives this vague example of insurance. Insurance. What, insurance that the stock market won't go down? Or the investment won't go down? That on its face, you don't have to be very sophisticated to say how in the world does that work? Well, Your Honor, I disagree. I'm asking this question against the basic premise that we have to, you have to demonstrate some reasonableness of reliance upon it. So I think part of the reasonableness is that the product he described does exist. You can buy a product that supplies exactly what he promised, a guaranteed income, and to have your principal out at the end of the day. Now, the details are in how much it costs. Those depend on interest rates. But this product absolutely does exist. And so when he made this promise, it's not ludicrous for them to think that this is what they were getting. It's not what they got, right? But I don't think it's unreasonable for them to trust their insurance advisor in this. I guess I'm just saying it won't work under the terms of the policies there. So you're actually saying they just didn't rate what they got? Your Honor, they didn't understand what they got for sure, right? There are two levels of argument about the policies themselves. One is the argument the district court embraced, and that's the literal argument, that if you drill down on these policies, they don't actually supply the warnings. When Judge Rosenthal went with you, and that's what I think a prudent district judge should do, is, OK, we'll try it. And then if you have your record, then she intervenes it. So you can have your shot at it. But in other words, you had a shot at it, and you got a verdict. But she also had a real problem, I think. She gave you your verdict, but then she took it back to let you make your argument. We don't fault her for that, Your Honor. We think it was the right thing to do. Well, that's what she should do. It's an efficient way to do it. That's right. I think the account statement... I don't have any quarrel with her doing that. Neither do we, Your Honor. But I think if you zoom back a little, there has to be some understanding of a contradiction generally in Woodbury's position. The industry as a whole takes the position, hire us because we know better than you, right? This is why they supply the advice, because they are experts in this matter. And Texas law is okay with that. It says you can make those representations so long as you're very careful of what you say. It's why the insurance code supplies the cause of action that we suit on here. But it's precisely because of that risk shifting that Texas law says is okay that this cause of action should be valid. They can validly trust in these advisors. We lean on the line of decisions from Boyle and Taylor in the insurance contest for an important reason, because Texas law has held for decades that if there's a choice between trusting your advisor and mastering the documents themselves, it's not unreasonable as a matter of law to trust the advisor. They certainly get a fact question on this. And they can make all kinds of arguments they want to, but the arguments they make are factual arguments. It's the argument that he wasn't trustworthy anymore or he wasn't credible. And those just aren't matters of law that decide these kinds of questions. We can see a similar situation in the Illinois Central decision, which Judge Haines will recall, between two lawyers. And the court said when lawyers on either side of a case are making representations to each other, they ought to be able to... That's very, very... First of all, it was Mississippi law. And second of all, it was very, very specific to lawyers in a lawsuit, not just anybody under the sun, including insurance agents, just believing somebody who keeps clearly lying to you that's clearly belied by the documents you're getting. I agree that it was Mississippi law. I think the underlying principle of limitations is the same. No, because it was having to do... It was very, very specific about counsel. And in the context of a lawsuit. And very specific to the facts of that case. It wasn't some broad pronouncement that anytime anybody tells you anything, you can rely on it, which is kind of how you're characterizing it. So, yes, I remember the case, and I think that you have way broadened it beyond its actual moorings. Well, if we need to recede to Texas law, that's fine, because we do assert the Boyle and Taylor rule aggressively for a reason. I think it does stand for this proposition. Not that we're correct as a matter of law. Not that you can always rely on the agent. But it's not unreasonable as a matter of law. We've given you both Supreme Court decisions on that point. We've given you a recent Texas Court of Appeals decision. But that gets you past the original documents. It doesn't really get you forever. And his second round of, you know, he says the markets fluctuate, whatever. He's starting to kind of be vague. And as Judge Smith pointed out, it's inconsistent with the documents. So the second time that you talk to Mirandorf, it's a very different thing than the first time. And Judge Rosenthal didn't fault your clients on the first time. She kind of spotted you there. She said, once you're getting these documents and you say, well, stuff fluctuates and whatever, you know, and it's kind of getting vague, then you know you've got a problem with this guy that you at least need to pursue further. That's the argument. Well, I think, Your Honor, if someone's double counting, it's them and not us. I think they get to count the initial documents once to say that you're on the storm warning. I don't think they get to count them again and say that you should disbelieve the new explanation because of the original documents. We point... We're not talking about the original documents. We're talking about the quarterly statements. Sure. So after the statements come out, then he gives the additional misrepresentations. I think this is why this fits the Hooks pattern from the Texas Supreme Court, where you have initial statements, you have some fraud that essentially taints the documents, and then more misrepresentations. And I think Hooks holds, you'll see this on page 59 through 61 of Hooks, is that when you have the second misrepresentation, plaintiffs are not obliged to go back in time and try to find the truthful representation that starts out. And so we commend that part of the decision in Hooks because I think it's squarely on point here about truth first, then the misrepresentations, and that a plaintiff isn't obliged to go back in time. I think that's exactly this case. And to emphasize again, we're not asserting that this is a matter-of-law point in our favor, but simply that there's a fact question somewhere. I think we all acknowledge that generally the question of reasonable diligence is one effect, that generally the question of what they would have discovered is one effect. And I think it's very hard to write this decision and still leave that as the general rule. Now, if you hold for the plaintiffs in this case, you're not gonna upset the rule that applies in the minor cases. In most cases, you have documents only, but you don't have that here because they're both documents and verbal representations. In most cases, you're talking about classic security, sort of get rich on a stock, but here you have a different kind of promise. And so I think that's why this really is an extraordinary case. There's a reason Woodbury doesn't challenge liability here. It's because this agent essentially went off the reservation and it really is an extraordinary case that I don't think will open up any floodgates of that nature. If the court has no further questions, I'll reserve the balance of my time. Yes, you've saved time for rebuttal. Thank you, Mr. Flores. Mr. McDowell. May it please the court. This is not a case about appellants ignoring storm warnings. This is a case about appellants ignoring the storm itself. Appellants claim that Mirandorf made three promises to them. Number one, that their principal would never go down. Number two, that they are guaranteed a rate of return of 7% each and every year. And number three, there was some vague insurance component that protected the investment. However, as Judge Rosenthal found, the cascade of information that these folks received from the time they purchased the annuities would have put a reasonable person on notice of their claims against Mirandorf. That's why Judge Rosenthal ended her underlying order the way she did. Well, why isn't that a question for the jury? Because as this court has ruled, as the Texas Supreme Court has recently ruled, the issue of the discovery rule can be determined as a matter of law based on the overall facts. And that's what Judge Rosenthal did. Judge Rosenthal looked at the total mix of information, beginning with the quarterly statements in 2008, and she found that no reasonable jury could have found the way they did. As Judge Rosenthal said, you can start and stop the analysis with the 2008 quarterly statements. But what about going back to Mirandorf? So they do, you know, the argument is, they do get the quarterly statements that go, whoa, wait a minute, I thought I had 500,000. This says I have 400,000. They call up Mirandorf, he goes, oh, yeah, you know, that's how those things are, but you got insurance, you're good. Why isn't that good enough to be reasonably diligent? Because what Mirandorf did is he basically disclaimed two of the three promises that he made. He didn't say anymore that the principle was guaranteed. He certainly didn't say anything about it earning 7% each and every year. And by that point, they had to know, based on the statements themselves, that it wasn't going to earn 7% every year. All he said was that there was some concept of insurance. But all the investor cares about is whether he or she ultimately, at the end, is going to get what he or she thought the promise was. So if there was a reasonable belief that, hey, insurance is going to cover any problems here, then a reasonable person might rely on that, and that's a jury question. Right, but how could there be a reasonable belief as a matter of law when the man has already walked away from the two of the three promises that he made? At that point, it was incumbent. Because of the insurance. Even if this guy's lying and he's a cheat and he's a fraud, there's insurance at the end. We're paying a little bit of extra here and a premium for insurance. It's like an insurance company that covers a municipal bond issue or something like that. It's going to all come out OK in the end. Right, and at that point, it was incumbent upon the appellants to go back and look at what the insurance was. Where is this insurance? Where's the policy? Where's the language? What does it cover? Where's the premium? What are the exclusions to it? If that is the loan safety net of your entire retirement savings, you have to determine if it actually exists or if it's like a fairy tale like the other two promises that you're saying. Who was the seller of this insurance to begin with? I thought it was an insurance company. I'm sorry, I didn't. What was the seller? I thought this was an insurance company that sold this product. Sure, Hartford sold the annuity in question. That's not an insurance agency company? Hartford is an insurance company. Yeah, OK, I assumed that. So it is an insurance company, and they say the insurance is going to pay for that. They already have an insurance company that they're talking about. And so that means you move very close to saying, if not you are saying, that this company is guaranteed. The company is guaranteed, and it's not a vague insurance problem, because you are an insurance company. That's right. Right, Hartford is an insurance company. So these people are willing to, that's what they're talking about. Insurance is going to cover it. That's who's selling to them is an insurance company. That's right. And your honor, I think that you need to get away from this guy that's out there lying like a sailor and going to his reward. What you have is an insurance company that's peddling a product through agents. And the result of what this process is that assurances are being given that the insurance company is going to guarantee that payment there. Now, what insurance company is he leading them to believe? The insurance company is going to go to reinsurance or something to what? I think it's perfectly reasonable to conclude that that guarantee is his own company. And I would disagree, your honor. I don't think it's reasonable for them to conclude that once Mirendorf walked away from two of the three promises that he made. And all these folks had to do was then go back and do what this court has said. What was it? Point me to the first large flag that they should have seen. And then I'd go from there. What's the first big warning flag for these people? It's our position that it's the underlying documents themselves. But Judge Rosenthal, I think, found, and it's certainly a good place to start, the 2008 quarterly statements. Those statements show reduction in value. And the record is very clear that the appellant said that if there was a reduction in value of their annuities, that that would be contrary to the promises to the representations made by Mirendorf. One of the plaintiffs asked, well, this thing is kind of dropping a little low here. Not bothered by the fact that so much is dropping low, but wondering whether the insurance company is going to put it back. And so he asked him, shouldn't we be filling this thing back up, right? That sounds to me like what he's thinking is, there's one insurance company that's involved here. And in other words, that was a guarantee they made. And yeah, the count's going down, but that was a risk you took to put it back up. That's right, Your Honor. And again, that was a response he got. Don't worry about it. They're going to take care of it. That's what Mirendorf said to everybody. Don't worry about it. Don't worry about the fact that I lied to you about the principal always being preserved. Don't worry about the fact that the 7% increase. That doesn't tell me he lied to me. All it tells him is that if he reassures him that, yes, that's what the record shows. But what he's telling him is that the company is still going to put that money back. And there is no way, Your Honor. So to speak, put it back as if they're going to continue to make the payments and still have the principal at the end of the day. And Your Honor, there is no way that you can look at what Mirendorf said and look at the total mix of information. And dealing with the promise of earning 7% each and every year, there is no way that he affirmed that promise. He told them that your investment is now subject to market risk. It goes up. It goes down. The market's going to come back. But don't worry. You have insurance. And it's our position that it's at that point that an objective, reasonably objective person would have gone back and looked at the underlying documents to see whether or not there was actually this insurance. What is that insurance? Again, what is the scope of coverage? Is there anything in the record, or was there anything presented to the jury regarding some separate insurance component? No. No, there was no separate insurance component that was part of this policy. The underlying documents, had they looked at it, would have put them on notice. Karen Gallier testified at page 3833 of the record that had she seen the third sentence of the annuity,  says this contract is a contract under which the investment risk is borne by the contract owner. Had she seen that language, she said, mister, I would have run the other direction. The perspective. Insurance companies, they settle major personal injuries that you're used to by annuities, essentially. That rather than pay them $2 million here against the risk of a $6 million verdict, they would pay them the $2 million, but it would be paid out over a lifetime by the company over that period of time. Annuities, selling annuities, annuities is kind of a flag itself, I guess, but it should be. But nonetheless, what I'm saying to you is that an insurance company would undertake to guarantee a life payment and satisfy some of the liability is a common practice, isn't it? Not under these circumstances, no. No, of course not. Not under the circumstances where the guy's lying and people tell him what they got. I'm just trying to start back with there's nothing startling about an insurance company that's in the business of giving assurances of a payment for life and settlement debt. But ordinarily, as I've experienced, that's in the context of settling some greater exposure that they have. That's right, but certainly not at 7% every year. I agree with you. The notion that we're going to guarantee you this, we'll take all the risk of the market is rather extraordinary. Well, that's exactly right. How do you then explain the Hartford's principal first rider that says that the point about the being variable doesn't apply to income guaranteed under the principal rider? So wouldn't I think then that all of these warnings I'm getting don't apply because there's this guaranteed income? In your honor, that rider is a great example of what happens when you look at the underlying documents. On page one of that rider, it says that what they're guaranteed to get back is essentially the amount of their investment. That is the hedge they have against market risk, is if they put in $500,000, they'll get $500,000. I can't get less than $500,000 is what you're saying. They can't get less than $500,000. They can only take out a certain amount each and every year, but they're only going to get $500,000. Once it hits $500,000, it doesn't matter if they're alive or if they passed away, obviously, they're not going to get it. And that isn't clear. OK, wait a minute. So I could never do better than that, even if the investment did well? You could do better than that. I could do better, but I can't do worse. But the better is not guaranteed. So in other words, if I chew up the $500,000 by my annual or monthly payments, and the investment didn't cover that, I'm done. That's what you're saying that this says. It's a little bit less than perfect. I will say it doesn't say insurance. I was an insurance lawyer 100 years ago, and I was looking for an insurance policy, and I didn't find one. It doesn't say insurance, and nothing in there says that they're going to get payments for the rest of their life. And nothing in there says anything about the principle being guaranteed. Although it is big sold by a regulated insurance company. Although it is big sold by a regulated insurance company. It is, but it's still a contract. You still have to look. But I mean, when I buy a homeowner's policy, I get a policy in the mail. I may or may not understand it, but I get it. It says a bunch of stuff in it. And you're going to be charged with knowledge of what's in that policy, unless you can show you were reasonable in not looking at it at the time of issuance. And that's this whole Boyle-Taylor line of cases, which really doesn't do anything to advance the ball here, right? Because all that is doing is assessing the reasonableness of the actions in not looking at the policy. I don't think it applies in these cases. Well, really, what Tesoro says, I mean, there's been a lot of debate about that. But what Tesoro says in part is, once you realize, I mean, once you have a reason to go back and read the policy, then you can't keep relying on this, I didn't read the policy, at least as far as discovery rule applicability, if any, is. And so it would seem here, I mean, you've got a statutory discovery rule, so Tesoro isn't directly applicable. But it would seem here that even if they took whatever blob of papers they got, they stuck it in their folder like most people do, now when they get that quarterly statement, they go, whoa, wait a minute, hey, honey, do you remember where that thing was? And you go and pull it out and go, what is this? I don't see insurance in here, you know, whatever. Even if Judge Rosenthal was correct in saying the initial documentation doesn't put you on notice, really, because in Boyle, you don't have to read it, once you get the quarterly statements, then you need to go back and look, and then there's nothing in there that says this is your insurance policy governing your principle. Right, if we were to accept appellant's view of the world, what you'd have to accept is the notion that the Texas Insurance Code incorporates a discovery rule that doesn't actually apply in the context of an insurance contract. That makes absolutely no sense whatsoever. The discovery rule is codified for a specific reason. We used to have that circular stuff that they kind of dealt with. The discovery rule is codified for a specific reason, and the discovery rule under the insurance code is applied the same way as under the securities laws. And again, in that context, this court has identified the steps that a reasonable investor is supposed to take. They were supposed to take reasonable steps to look at what they purchased. If you're gonna put your life savings, your retirement savings into something, you gotta look at what you purchased. A reasonable investor cannot sit back and allow the facts to come to them. They have to be a proactive agent in determining whether or not they have. And if we step back and say who should bear the risk of the fraudulent agent, shouldn't it be the people who hired him rather than the people, the unknowing public? In certain circumstances, absolutely. And in the, you know, honestly- In all other cases. I'm sorry? Certain circumstances, I mean, you're talking about in other cases. In other cases, you're right, Your Honor. Look, the application of the statute of limitations on unsophisticated investors can be a harsh thing, but there's a public policy behind the statute of limitations, and this court has not shied away from enforcing that public policy when the circumstances require it, and that's exactly what Rosenthal did. How many jurors did Judge Rosenthal seat in this case? How many jurors? How many jurors did Judge Rosenthal seat in this case? I wasn't part of the trial process, Your Honor. Jason, there were 12. 12. 12. She's a true believer, I'm just checking on her. Yeah. Well, you get a 12-person jury going one way, that's something you ought to listen to, don't you think? Not when the facts say otherwise, no. Well, that's good. Well, it's a question of the reasonableness of what an ordinary person is going to do. That's what we ask for, community values and so forth, and not the sophisticated or not, or at least certainly the weary views of a bunch of judges and lawyers who've heard this 100 times kind of thing. Right, Your Honor. Can I go back to Judge Smith's earlier question about it's not an easy case, we struggle with it, and it seems like a terrible fraud, perhaps, or was, I guess, but then the question is, it's really ultimately who decides. Right, and I think here, the decision of who decides is clearly set forth by the law. Judge Rosenthal did the right thing. She gave it to the jury. She wanted to have a full development of the factual record and a full development of the legal arguments, and once she determined that as a matter of law, there was no legally sufficient basis on which the jury could find the way it did, she employed the statute of limitations and ruled in favor of Woodbury. And I think if we step back and we look at the major touchstones, the cornerstones of her ruling, we'll see why she did what she did. Those statements, those 2008 annual statements are so alarming, so concerning, that those in and of themselves put them on notice. They could have filed a cause of action at that time against David Mierendorf based on those statements. There was no guarantee of principle. There was no guarantee of the 7% rate of return. If you then go to what Mierendorf told them, where he basically says, yeah, those first two promises, not true, you got the insurance, well then a reasonable person would have gone back and looked at the underlying documents, and as Judge Rosenthal found, the prospectus would put them on notice, the annuity would have placed them on notice, the application that all the appellants said they signed in blank or might have signed in blank that said may lose value would have put them on notice. And the fourth thing she looked at were the other quarterly statements that never showed or didn't show. For example, Ms. Harrison, if you look at her December 2004 annual statement and her December 2005 annual statement, there's no 7% gain on the annuity. It showed the benefit amount that's referenced in the principle first rider going down each and every quarter. All of that information taken together would have put a reasonable person on notice that they had a claim against David Mierendorf. And no expansion of the Boyle-Taylor Doctrine or elevation of the Fraudulent Concealment Doctrine is going to change that fact. And what Judge Rosenthal did is consistent with what courts have done around the country. As we've cited in our brief, the Cope v. Stifel-Nicholas case from the Eighth Circuit said that a person that is receiving annual statements that shows that their investment is going down should have, as a matter of law, asked more questions. The Third Circuit, Matthews v. Kidder of Peabody, references a mix of information and says that the decrease in account values and distributions should have placed appellants on notice that investments were not safe, conservative investments, as promised. The Southern District of New York, Judge Mukasey and Merrill Lynch said, quote, clear evidence that an investment asset has declined in value and direct... Let me take you back to Counsel Opp's statement and I think in response to my question where he went back. The first, I asked a question about reasonable diligence and they said, well, the first, and I was asking the question, first time they went to someone that was responsible for the company, they got a quick, straightforward answer, no, that's not it, what? And he pushed back to no. There was an earlier meeting. Now, talk to me about that earlier meeting. Why is it that, is that not fairly read as really evidence for which a jury could conclude that there was really a concealment of the ongoing process? Right, I think what Counsel was referring to was a written, I think what Counsel was referring to was a written request that was made to Hartford that basically said, how long are my payments gonna last? She didn't ask, are they guaranteed for life? She said, how long are my payments going to last? And what Hartford said is, we don't know. If it was guaranteed for life, they would have said, they're guaranteed as long as you live. They said, we don't know, because they didn't know how long it was going to last. That should have dyed the flag a brighter shade of red at that time as well. What they gave Ms. Tacker in 2012 was nothing more than what they already had in their possession. They clearly didn't say, here, you have an insurance policy. They didn't say that. And they're the insurance company. You should have the policy if there is one. Right, and again, the reasonable inquiry to Hartford would have been, are those promises true? Well, the easy way to do it would say, look, you made an investment, it's a risk. There may be no money here. And we didn't guarantee anything. They don't say that. But they can say that. No, no, no. The jury may say they were dancing a little too closely. They were carefully phrasing this and being very careful what they said, but in language that itself was affirmatively misleading. In other words, you can dispel them very quickly from what they're, they're plainly asking about an instrument that does not do what they've been told. And you can answer that directly by saying, this is not what the man told, this is not it. But they didn't ask Hartford to affirm what the man told them. They didn't say, Harrison did not say, am I going to get payments for life? She said, how long are they going to last in Hartford? Because you're not just limited to 7% withdrawal every year. You could take more, you could take less. There's no way Hartford's gonna know what Ms. Harrison wants to do in two years. That's why they said, we can't tell you. Unfortunately, we don't know. Your Honor, I'm out of time. Does the panel have any other questions? Thank you, Mr. McDowell. Thank you. Morris, you've saved time for rebuttal. So what do you do with these statements that your clients signed that said it may lose value? How does that fit into the record here? I think it's part of the circumstances the jury gets to consider. There are points going both ways, and that's a point against us. Now, importantly, the inquiry is an objective one. So the question is what a reasonable investor would have taken from these documents. But the same reason that we can't say our investors were unsophisticated, they can't say that a particular piece of testimony on our plaintiff's cuts against us. So I think we need to both play by the same rules there. I think Woodbury has done too much in defining the promises. When the court lays its hands on the record, what you'll see is that when the plaintiffs were asked to testify about what the promises were. Oh, we have laid our hands on the record, and it's a mush what they say they were promised. Indeed, Your Honor. Oh my goodness. And nowhere in there is there a promise that there's like an insurance policy. It's this very vague thing, I assumed that at some point I would get the money back. Another guy assumes that the money will be put in as it comes out. Then someone said, well, maybe it has to go down to zero. I don't really know. This isn't consistent with having a representation made to you, just imagining a bunch of ways the insurance could work. So yeah, we looked at the record, and it doesn't really help you on that point. Well, Your Honor. In my humble opinion. There's a reason Woodbury didn't challenge the liability findings. That's what that would go to, is whether they believed the promises and what the promises were. If there's play in the joints, and some testimony saying the promises were A, B, and C, some testimony saying it was just A and B, the standard review says that since we won the verdict, that we have to take the case as though the jury believed a set of promises that it could answer yes as to liability. Yeah, but there has to be a promise that they say was made. Just saying, well, I didn't really know how the insurance worked. I just assumed this or that is no evidence of anything. We have much more than that, Your Honor. Respectfully. So point me to the best explanation of what Mirandorf told them the insurance would do. The best, you know, in this long involved record, what do you want us to look at that you think would go, oh my God, this was a fat question. We really need to step back. If you want the definition of the promises, you can look in the first brief at the block quotes. We've given you block quotes of string citations for all four plaintiffs that show three things. He promised the monthly payment at the end of every month. He promised that the principal would be there when they die and that it would be protected by insurance. Those are the three. Now there are also- But how the insurance works is, to me, the harder thing because I understand they were promised insurance. I get that. But then the question is, since this is a limitations case with a discovery rule, when were they put on notice? And so if, let's imagine that they had clearly said that the insurance was that if the principal went down, bam, more money's put in, they would know from the quarterly statement that didn't happen. If it was that it would go to zero and then the money would be put in, then the quarterly statement wouldn't tell them that. They don't know. They're all over the place on that. So how can we, I mean, that's their burden ultimately at trial. I think they do know, Your Honor. It's on page 12 of our reply brief. And in the record, it's page 5125. That says the insurance kicks in when the amount hits zero. And if you want to see the policies to get an idea of what we're talking about, this is the set of initial documentation. Not for all of the plaintiffs, for one of the plaintiffs. And so when we say go back and read the documents, you'll find an answer. I think this gives some context of what the jury had when, remember, there was an expert witness who testified to this functional idea that even if it says literally what Woodbury says, that a layperson can't contemplate what these documents actually say on specific matters like this. And so I think both of these things, if ever there were a case where the notice effect of a document is a fact question, I think it's got to be this case where you have extremely complex, lengthy documents plus fraudulent exchanges occurring. So that's our position as to the storm warning analysis. The last thing I want to say is that it's important for the court to keep these three inquiries distinct. There are three separate parts of the analysis that Woodbury had to prove as a matter of law. And I'd like to think that I do well on all three fronts, but even if you think I lose really badly on the storm warning front and really badly on the front of it, the reasonable diligence that did occur, Woodbury still has to prove as a matter of law what the plaintiffs would have discovered. And this instance of Harrison in 2009 has got to be a key part of the opinion because there are two pieces of competing evidence. There's the instance of Tacker in 2012 where the wrongdoing was discovered and the instance of Harrison in 2009 where the plaintiffs do exactly what the documents tell them to do, call the insurance company. It says insurance on the cover. And she gets a mixed response. I take the point that it could be, that we could dispute exactly what that response is, but I think if ever there's a case where it's a fact issue, it's got to be this case. If there are no further questions, we'll submit. Thank you, Mr. Flores. Your case is under submission. The court will take a brief recess before hearing the.